[996 NYS2d 716]

In the Matter of V. ANTHONY MAGGIPINTO, an Attorney, Respondent. GRIEVANCE COMMITTEE FOR THE TENTH JUDICIAL DISTRICT, Petitioner.

Second Department, December 10, 2014

**APPEARANCES OF COUNSEL**

*Mitchell T. Borkowsky*, Hauppauge (*Nancy B. Gabriel* of counsel), for petitioner.

*John L. Juliano*, East Northport, for respondent.

**OPINION OF THE COURT**

Per Curiam.

The Grievance Committee for the Tenth Judicial District served the respondent with a verified petition, dated September 19, 2011, containing four charges of professional misconduct. The Special Referee sustained all four charges. The Grievance Committee now moves to confirm the report of the Special Referee. The respondent, by his attorney, opposes the Grievance Committee's motion to confirm the report of the Special Referee. He argues that the Grievance Committee failed to establish, by a fair preponderance of the credible evidence, that he violated any of the disciplinary rules set forth in the verified petition and, accordingly, that the petition should be dismissed.

The charges emanate from a common set of facts, which, based on the evidence, we find as follows:

## Background

At all relevant times prior to March 2003, Kathryn Cerullo owned and resided in a single family residence located at 72 Halsey Street in Southampton (hereinafter the Cerullo residence or the residence). The residence had been owned by the Cerullo family since in or about 1923 and, at all relevant times, was encumbered by a reverse mortgage held by Seattle Mortgage Company, which provided Kathryn Cerullo with a monthly draw against the equity in the home. In March 2003, Kathryn Cerullo was 74 years old, unmarried, with no children.

At all relevant times, the respondent and his wife owned a single family residence at 80 Halsey Street in Southampton, located next door to the Cerullo residence. At various times prior to 2003, the respondent provided legal assistance and services to Kathryn Cerullo and the Cerullo family.

In or about March 2003, the respondent referred Kathryn Cerullo to an attorney, John P. Garvey, with whom the respondent had an existing business relationship, to assist Kathryn Cerullo with, among other things, estate planning and the creation of a trust.

On or about March 28, 2003, Kathryn Cerullo executed an irrevocable trust (hereinafter the trust) prepared by Mr. Garvey. Pursuant to Article 4 of the trust, the primary beneficiary was the Church of the Sacred Hearts of Jesus and Mary in Southampton (hereinafter the Sacred Hearts Church). Pursuant to Article 5 of the trust, the alternate beneficiaries, in the event that the Sacred Hearts Church no longer existed at the time of Kathryn Cerullo's death, were Kathryn Cerullo's nieces and nephews, including, among others, Mary Linda Goleski, Michael Cerullo, and Judith Ann Cerullo Kossow. The respondent was appointed trustee of the trust, subject to removal as provided by Article 7, Section 2, of the trust. The respondent executed the trust, as trustee, on or about March 28, 2003.

Pursuant to Article 2 and Schedule "A" of the trust, the "initial trust property" was to be $10 plus a remainder interest in the Cerullo residence.

On or about March 28, 2003, Kathryn Cerullo executed, and delivered to the respondent, a bargain and sale deed, wherein she conveyed the Cerullo residence from herself to the respondent as sole trustee of the trust. Pursuant to the deed, Kathryn

Cerullo retained a life estate for herself in the Cerullo residence.

At all relevant times, Kathryn Cerullo also maintained two bank accounts at Astoria Federal Savings Bank: a money market account, designated as account number xxxxxx5160 (hereinafter the money market account) and a checking account, designated as account number xxxxxx1288 (hereinafter the checking account). Kathryn Cerullo's main sources of income were Social Security benefits and monthly draws against the reverse mortgage held by Seattle Mortgage Company. At the time she executed the trust, Kathryn Cerullo's monthly Social Security benefits of approximately $746 were being deposited into the checking account, and the monthly draws of approximately $850 against the reverse mortgage were being deposited into the money market account.

Between March 28, 2003, and July 2005, Kathryn Cerullo continued to reside in the Cerullo residence and manage her own financial affairs, drawing checks against the money market account and the checking account to pay, among other things, her credit card obligations and other bills, including the expenses of the Cerullo residence.

In or about July 2005, due to her deteriorating health, Kathryn Cerullo decided to move to Nevada to live with her niece, Judith Ann Cerullo Kossow. Pursuant to a letter of engagement dated July 28, 2005, the respondent undertook to prepare estate planning documents for Kathryn Cerullo, including a last will and testament and a durable general power of attorney (hereinafter the power of attorney). On or about July 29, 2005, Kathryn Cerullo executed the last will and testament and the power of attorney prepared for her by the respondent. Pursuant to the power of attorney, the respondent was appointed Kathryn Cerullo's attorney-in-fact. Prior to leaving for Nevada, Kathryn Cerullo entrusted the respondent with, and the respondent accepted responsibility for, paying the bills associated with the unoccupied Cerullo residence, and paying her credit card obligations and other bills in her absence.

In or about July 2005, pursuant to the power of attorney, the respondent took control of Kathryn Cerullo's money market account and checking account, and arranged for Kathryn Cerullo's bank statements, as well as credit card invoices and other bills, to be delivered to his office located at 1212 Roanoke Avenue in Riverhead. Commencing on or about July 29, 2005, the respondent undertook to pay Kathryn Cerullo's credit card

obligations and other bills, including bills and expenses associated with the unoccupied Cerullo residence, using funds in the money market account and the checking account. On or about July 29, 2005, the combined balance of Kathryn Cerullo's funds on deposit in the money market account and the checking account totaled $42,639.71, consisting of $42,263.21 in the money market account and $376.50 in the checking account.

On or about September 1, 2005, the respondent opened a new account at HSBC Bank entitled "V. Anthony Maggipinto," designated as account number xxxxx8895 (hereinafter the trust account), purportedly for use in his capacity as trustee under the trust.

### Money Market Account Transactions

Between July 29, 2005 and April 29, 2006, additional funds totaling $31,704.48 were deposited in or credited to the money market account, consisting of $31,650, which, to some extent, was generated by draws against the reverse mortgage, plus $54.48 in interest earned on the account. The total amount of Kathryn Cerullo's funds flowing through the money market account between July 29, 2005, and April 29, 2006, was $73,967.69, consisting of the initial balance of $42,263.21, plus the additional receipts of $31,704.48.

Out of the $73,967.69 flowing through the money market account between July 29, 2005, and April 29, 2006, a total of $2,084.20 was allocated to pay expenses ostensibly incurred by Kathryn Cerullo in connection with the maintenance of the unoccupied Cerullo residence, as follows: three checks drawn by the respondent totaling $2,056.20, and $28 in bank fees. In addition, out of the $73,967.69 flowing through the money market account between July 29, 2005, and April 29, 2006, the respondent drew four checks, totaling $3,050, payable to himself, as trustee, which he deposited into the trust account, three checks, totaling $15,000, payable to himself, as trustee, which he also deposited into the trust account, ostensibly as a "loan" from Kathryn Cerullo to the trust, and six checks, totaling $25,760, payable to himself. Moreover, out of the $73,967.69 flowing through the money market account between July 29, 2005, and April 29, 2006, the respondent transferred $28,073.49 to the checking account. As of April 29, 2006, the balance in the money market account was zero, and the money market account was closed.

## Checking Account Transactions

Between July 29, 2005, and August 31, 2006, additional receipts totaling $14,395.70 were deposited in or credited to the checking account, as follows: $9,882 in monthly Social Security benefits; $263.70 in miscellaneous deposits; and, subsequent to the closing of the money market account on April 29, 2006, $4,250 in monthly draws against the reverse mortgage. The total amount of funds flowing through the checking account between July 29, 2005, and August 31, 2006, was $42,845.69, consisting of the initial balance of $376.50, the additional receipts of $14,395.70, and the $28,073.49 transferred from the money market account.

Out of the $42,845.69 flowing through the checking account between July 29, 2005, and August 31, 2006, the respondent drew checks against, or caused transfers to be made out of, the checking account, totaling $7,659.83, to pay various expenses ostensibly incurred by Kathryn Cerullo in connection with the maintenance of the unoccupied Cerullo residence. Such payments included, but were not limited to, payments to Chase Credit Card Services, Verizon, AT&T, Cablevision, Keyspan, and Long Island Power Authority. In addition, the respondent drew six checks, totaling $22,700, payable to himself, as trustee, which he deposited into the trust account, ostensibly as a "loan" from Kathryn Cerullo to the trust. Moreover, the respondent also drew seven checks against the checking account, totaling $11,637.37, payable to himself. As of August 31, 2006, the balance in the checking account was $848.49.

## Trust Account Transactions

Between September 1, 2005, and August 31, 2006, the trust account was funded predominantly by the respondent's transfers of Kathryn Cerullo's funds from the money market account and the checking account, totaling $40,750. Such transfers consisted of four checks, totaling $3,050, from the money market account, three checks, totaling $15,000, from the money market account, ostensibly as a "loan" from Kathryn Cerullo to the trust, and six checks, totaling $22,700, from the checking account, ostensibly as a "loan" from Kathryn Cerullo to the trust. The trust account also was funded by a one-time lease deposit, on or about May 19, 2006, in the sum of $10,000, received by the respondent from one Michael Wudyka, for the rental of the Cerullo residence. The amount of Kathryn Cerullo's funds that flowed through the trust account between September 1, 2005, and August 31, 2006, totaled $50,750.

Out of the $50,750 of Kathryn Cerullo's funds flowing through the trust account between September 1, 2005, and August 31, 2006, the respondent drew various checks, totaling $3,786.24, to pay expenses ostensibly incurred by Kathryn Cerullo in connection with the maintenance of the Cerullo residence. Such payments included, but were not limited to, payments to Chase Credit Card Services, Verizon, AT&T, Cablevision, Keyspan, Long Island Power Authority, State Farm Insurance, and the Suffolk County Water Authority. The respondent also drew two checks, totaling $5,100, payable to RLW, Inc., a construction company, and one check, in the sum of $166.67, payable to Seashell Real Estate. In addition, the respondent drew numerous checks, totaling $40,111.10, payable to himself. As of August 31, 2006, the balance in the trust account was $1,585.99.

Summary of Transactions and Payments to the Respondent

Between July 29, 2005, and August 31, 2006, a total of $98,739.89 of Kathryn Cerullo's funds flowed through the money market account, the checking account, and the trust account, collectively. Such funds consisted of the beginning balances on July 29, 2005, of both the money market account ($42,263.21) and the checking account ($376.50), the additions to the money market account ($31,704.48) and the checking account ($14,395.70), and the real estate lease deposit ($10,000).

Out of the $98,739.89 of Kathryn Cerullo's funds that flowed through the three accounts related to Kathryn Cerullo over which the respondent had control, either as attorney-in fact or as trustee, the respondent paid or disbursed approximately $18,796.94 to pay expenses allegedly incurred by or on behalf of Kathryn Cerullo. In addition, the respondent paid or disbursed a total of $77,508.47 to himself, comprising $25,760 from the money market account, $11,637.37 from the checking account, and $40,111.10 from the trust account. As of August 31, 2006, the combined balance of Kathryn Cerullo's funds on deposit in the money market account, the checking account, and the trust account totaled $2,434.48.

Failure to Account and Additional Payments to the Respondent

Commencing in or about July 2006, Kathryn Cerullo and her nephew, Michael Cerullo, began communicating with the respondent and requested, among other things, an accounting of

all funds belonging to Kathryn Cerullo in the respondent's possession, including the names of the banks and the account numbers in which Kathryn Cerullo's funds were deposited, as well as a list of all receipts and expenditures made on Kathryn Cerullo's behalf since 2005. The respondent failed to provide Kathryn Cerullo or Michael Cerullo with an accounting, or the banking information requested.

On or about September 18, 2006, the respondent deposited $7,500 of his or his wife's money into the trust account, ostensibly as a "loan" to the trust. Between September 18, 2006, and October 31, 2006, the respondent drew three checks, totaling $7,500, against the trust account, payable to himself.

On or about November 19, 2006, the respondent deposited $24,000 of his or his wife's money into the trust account, ostensibly as a "loan" to the trust. The $24,000 represented a portion of the proceeds of a mortgage loan that the respondent or his wife secured against their own residence in Southampton, located next door to the Cerullo residence. Prior to securing the mortgage loan against his own residence, the respondent, in his capacity as trustee under the trust, had sought a mortgage loan against the Cerullo residence, but was rejected.

On or about November 21, 2006, the respondent drew a check in the sum of $5,000 against the trust account, payable to RLW, Inc.

On or about November 24, 2006, the respondent drew a check in the sum of $5,000 against the trust account, payable to Judith Ann Cerullo Kossow, Kathryn Cerullo's niece, purportedly as a distribution pursuant to Section 2 of an amendment to the trust, dated September 21, 2005, which stated, in part, that

> "[d]uring the lifetime of the Trustmaker, the Trustees may pay to or apply for the benefit of Judith Ann Cerullo Kossow so much or all of the principal as the Trustees deem proper, in the Trustees sole discretion, to or for the health, education or maintenance of my niece Judith Ann Cerullo Kossow."

On or about November 30, 2006, the respondent drew a check in the sum of $7,750 against the trust account, payable to himself.

By letter dated December 8, 2006, Michael Cerullo advised the respondent that, among other things, he was replacing the respondent as Kathryn Cerullo's attorney-in-fact, pursuant to

a new power of attorney executed on December 4, 2006. Subsequent to his receipt of Michael Cerullo's letter dated December 8, 2006, the respondent continued to draw checks against the checking account and the trust account.

By letter dated May 2, 2007, Judith Ann Cerullo Kossow, by her attorney, Harvey A. Arnoff, advised the respondent that, pursuant to Article 7, Section 2 of the trust, he was being removed as trustee and replaced by Judith Ann Cerullo Kossow.

On or about April 9, 2008, Kathryn Cerullo and the trust sold the Cerullo residence for the sum of $1,100,000.

By letter to the respondent dated June 23, 2008, Michael Cerullo requested that he forward, among other things, all of Kathryn Cerullo's funds in his possession to Judith Ann Cerullo Kossow.

## The Charges in the Petition

Charge one alleges that the respondent converted funds entrusted to him as a fiduciary, in violation of former Code of Professional Responsibility DR 9-102 (a) (22 NYCRR 1200.46 [a]).

Charge two alleges that the respondent failed to account for monies entrusted to him as a fiduciary, in violation of former Code of Professional Responsibility DR 9-102 (c) (22 NYCRR 1200.46 [c]).

Charge three alleges that the respondent engaged in conduct involving fraud, deceit, dishonesty, and misrepresentation, in violation of former Code of Professional Responsibility DR 1-102 (a) (4) (22 NYCRR 1200.3 [a] [4]).

Charge four alleges that the respondent engaged in conduct adversely reflecting on his fitness as a lawyer, in violation of former Code of Professional Responsibility DR 1-102 (a) (7) (22 NYCRR 1200.3 [a] [7]).

Based upon the respondent's admissions, and the evidence adduced at the hearing, we find that charges one through four were properly sustained.

With respect to charge one, the Special Referee concluded, and we agree, that the respondent took advantage of his longtime relationship of trust with Kathryn Cerullo to unjustly enrich himself from the funds she entrusted to him, as a fiduciary, without her knowledge or consent. As Kathryn Cerullo's attorney, attorney-in-fact, and the trustee of a trust established

for her benefit, the respondent established a putative "trust account" in his own name, which he manipulated to garner over 75% of Kathryn Cerullo's funds for his own use and benefit. As the Special Referee correctly found, the respondent disbursed to himself amounts that were as "facially outrageous" as the activities for which they purportedly were paid. Under the totality of the circumstances, we find that the respondent engaged in willful misappropriation, and that charge one was properly sustained.

With respect to charge two, the Special Referee concluded, and we agree, that while the respondent may not have been asked for an accounting in the formal sense, the requests made to him by Kathryn Cerullo and her nephew clearly sought specific information about the status of Kathryn Cerullo's finances and her bank accounts. As the Special Referee reasonably concluded, "whether the term accounting was used is not the issue. Rather, information normally contained in an accounting was requested, and was not supplied." Moreover, as the Special Referee noted, the respondent's responses to inquiries by Kathryn Cerullo's nephew and the Cerullos' attorney concerning the respondent's activities relative to the power of attorney and the trust, "can hardly be described as [an] indication of . . . willingness by the respondent to account for the execution of his duties on behalf of Ms. Cerullo." We are especially troubled by the fact that the respondent continued writing checks against Kathryn Cerullo's checking account, and the putative trust account that the respondent established in his own name, until such time as he was advised by a bank employee that a new power of attorney had been signed, despite previously having been notified that he had been replaced as attorney-in-fact by Kathryn Cerullo's nephew, Michael Cerullo. Under the totality of the circumstances, we find that charge two was properly sustained.

With respect to charges three and four, the conduct articulated above necessarily involves elements of fraud, deceit, dishonesty, and misrepresentation, and reflects adversely on the respondent's fitness as a lawyer. Under the totality of the circumstances, we find that charges three and four were properly sustained.

In determining an appropriate measure of discipline to impose, we note the testimony of the respondent's witnesses as to the respondent's good reputation in the community, his participation in "numerous charitable undertakings for the

poor in the community," and his work as a Deacon in the Roman Catholic Church of Saints Philip and James. The Court also has considered, as requested by the respondent's counsel, the following: the respondent has been a member of the bar since 1977, having first been admitted in the State of Florida and then, in April 1978, pro hac vice in the Second Department, before being admitted to the New York bar on November 28, 1978. Moreover, he is admitted to practice in the United States District Court for the Eastern and Southern Districts of New York, as well as the United States Court of Appeals for the Second Circuit. He has served as an arbitrator in the Eastern District, and was appointed by the Honorable Jack B. Weinstein to the Discovery Committee of the Eastern District, for the purpose of reconciling the inconsistencies between the rules of the Eastern and Southern Districts. However, we note that the respondent himself failed to offer proof of any mitigation at the hearing. Rather, he testified solely and consistently that his defense was that he did nothing wrong. To that end, the Special Referee found, and we agree, that "the respondent was evasive and not forthcoming in any way." The Special Referee's finding relative to the respondent's credibility is entitled to great weight (*see Matter of Lodes*, 118 AD3d 54 [2014]; *see also Matter of Rodeman*, 65 AD3d 350, 352 [2009]; *Matter of Abady*, 22 AD3d 71 [2005]; *Matter of Cohn*, 194 AD2d 987 [1993]).

In 1993, the respondent was issued a letter of caution for failing to secure consent from clients prior to billing them for the services of a third party and, in 1998, he received a letter of caution for failing to prosecute a legal matter with satisfactory speed, and failing to pay an expense of litigation (i.e., a stenographic bill) from the ultimate recovery.

Under the totality of the circumstances, the respondent is suspended from the practice of law for a period of five years.

ENG, P.J., MASTRO, RIVERA, SKELOS and ROMAN, JJ., concur.

Ordered that the petitioner's motion to confirm the Special Referee's report is granted; and it is further,

Ordered that the respondent, V. Anthony Maggipinto, is suspended from the practice of law for a period of five years, commencing January 9, 2015, and continuing until further order of this Court. The respondent shall not apply for reinstatement earlier than July 9, 2019. In such application, the respondent shall furnish satisfactory proof that during said period he: (1) refrained from practicing or attempting to

42

practice law, (2) fully complied with this order and with the terms and provisions of the written rules governing the conduct of disbarred, suspended, and resigned attorneys (*see* 22 NYCRR 691.10), (3) complied with the applicable continuing legal education requirements of 22 NYCRR 691.11 (c) (2); and (4) otherwise properly conducted himself; and it is further,

Ordered that pursuant to Judiciary Law § 90, during the period of suspension and until the further order of this Court, the respondent, V. Anthony Maggipinto, shall desist and refrain from (1) practicing law in any form, either as principal or agent, clerk, or employee of another, (2) appearing as an attorney or counselor-at-law before any court, judge, justice, board, commission, or other public authority, (3) giving to another an opinion as to the law or its application or any advice in relation thereto, and (4) holding himself out in any way as an attorney and counselor-at-law; and it is further,

Ordered that if the respondent, V. Anthony Maggipinto, has been issued a secure pass by the Office of Court Administration, it shall be returned forthwith to the issuing agency and the respondent shall certify to the same in his affidavit of compliance pursuant to 22 NYCRR 691.10 (f); and it is further,

Ordered that on the Court's own motion, upon the finding herein that the respondent engaged in the willful misappropriation of Kathryn Cerullo's money in the practice of law, the respondent, V. Anthony Maggipinto, shall make monetary restitution to Kathryn Cerullo, or her estate if she dies prior to the completion of restitution, in an amount to be determined after a hearing, on notice to the respondent, pursuant to Judiciary Law § 90 (6-a); and it is further,

Ordered that Mitchell T. Borkowsky, Deputy Chief Counsel to the Grievance Committee for the Tenth Judicial District, 150 Motor Parkway, Suite 102, Hauppauge, N.Y. 11788, is hereby appointed as attorney for the petitioner in such proceeding for restitution pursuant to Judiciary Law § 90 (6-a); and it is further,

Ordered that the petitioner Grievance Committee shall serve upon the respondent, V. Anthony Maggipinto, and the Special Referee appointed herein, and shall file with this Court, a petition seeking to establish the specific amount of restitution owed by the respondent to Kathryn Cerullo pursuant to Judiciary Law § 90 (6-a) within 30 days after receipt of a copy of this opinion and order; and it is further,

Ordered that the respondent, V. Anthony Maggipinto, shall serve an answer upon the petitioner, and the Special Referee appointed herein, and shall file the original answer with this Court, within 20 days after service upon him of the petition; and it is further,

Ordered that the issues raised by the petition and any answer thereto are referred to John P. Clarke, Esq., 35 Broad Street, Williston Park, N.Y. 11596, as Special Referee, to hear and report, and to submit his report containing his findings on the issue of the amount of restitution to be made to Kathryn Cerullo, or her estate if she dies prior to the completion of restitution, within 60 days after the completion of the hearing or the submission of post-hearing memoranda.